IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO.: 7:22-cv-180


DEBBIE BALDWIN                    )
                                 )
          Plaintiff,             )
                                 )
v.                               )          COMPLAINT
                                 )
UNITED STATES OF AMERICA         )
                                 )
          Defendant.             )
_____)


## I.    **PRELIMINARY STATEMENT**

1.   Plaintiff, Debbie Baldwin (referred to hereinafter as "Plaintiff" or "Debbie"), brings this civil action for money damages pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§2671-2680, based upon the negligence and/or gross negligence of federal government employees acting within the scope of their office or employment.  The acts and omissions of the federal employees caused Plaintiff to suffer injury such that were the United States a private person, it would be liable to Plaintiff under the laws of North Carolina.

## II.   **JURISDICTION AND VENUE**

2.   Jurisdiction for this action under the FTCA is based upon 28 U.S.C. §1346(b).

3. Venue is appropriate under 28 U.S.C. §1402(b)in the United States District Court of the Eastern District of North Carolina as the acts and omissions of which Plaintiff complains occurred in Onslow County, North Carolina and as Plaintiff was at all times relevant to the allegations set forth in this Complaint, a citizen and resident of Onslow County, North Carolina.

### III. <u>PARTIES</u>

4. Plaintiff, Debbie Baldwin, was at all times relevant to the events set forth herein, a citizen and resident of Onslow County, North Carolina, United states of America.

5. At the time of this event Debbie lived with her husband, Carlos Mark Baldwin, ("Mark") a former member of the North Carolina Bar and her adult son, Joshua Gilchrist, who worked for Onslow County EMS.

6. Since these events Mark, has passed away and therefore there is no loss of consortium claim.

7. At the time of this event, Debbie was special eduction teacher in the Onslow County School System, a career she was not able to continue as a result of the injuries described herein.

8. At all times relevant to the events set forth herein, Richard D. McCormick, M.D., (hereinafter "McCormick") was a member of the United States Navy, was engaged in duty, and was a

-2-

lawful employee of Defendant United States of America, acting within the scope of his office or employment.

9. At all times relevant to the events set forth herein, McCormick held himself out as a physician, including being engaged in the practice of emergency medicine.

10. Upon information and belief, at all times relevant as hereinafter set forth, McCormick was a health care provider as defined by N.C. Gen. Stat. § 90-21.11, and was a health care provider for Plaintiff.

## IV. <u>NATURE OF THE CASE</u>

11. This action is a medical malpractice action as that term is used and defined in N.C. Gen. Stat. § 90-21.11 and Rule 26(f1) of the North Carolina Rules of Civil Procedure.

## V. <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

12. Pursuant to 28 U.S.C. §2675(a), the claim set forth herein was timely presented to the Department of the Navy, Tort Claims Unit Norfolk, Office of the Judge Advocate General via certified mail, return receipt requested on June 27, 2018. The claim was received on July 2, 2018.

13. As of the date of filing of this Complaint, the Department of the Navy, Office of the Judge Advocate General, Tort Claims Unit Norfolk, has failed to make a final disposition of Plaintiff's claim.

-3-

## VI. <u>STATEMENT OF FACTS</u>

14. At approximately 12:18 a.m. on December 3, 2016, Debbie presented to the Naval Hospital Camp Lejeune Emergency Department where the triage nurse noted Debbie's complaints as right-sided abdominal pain, nausea, and vomiting.

15. At the time of triage, Debbie's intial vital signs were heart rate of 98 beats per minute (Normal: 80-100), respiratory rate of 22 per minute (Normal: 12-16), temperature of 98.2° and blood pressure of 134/87. Her oxygen saturation was 96% (Normal: 93-100%)and Plaintiff reported her pain as 10/10 on the pain scale.

16. At or about 12:32 a.m., Joseph Kotora, M.D., entered orders for multiple laboratory studies, including complete blood count (CBC) with differential, complete metabolic panel (CMP), lipase and urinalysis.

17. Upon information and belief, McCormick examined Debbie prior to 1:00 a.m. on December 3, 2016. At that time, he noted Debbie's pain was sharp and stabbing, located in the right flank and was worsened by movement.

18. Upon physical examination, McCormick noted tenderness in the costovertebral angle (the area of the back overlying the kidneys) as well as moderate tenderness with guarding in the right lower quadrant of Plaintiff's abdomen. Pain and tenderness in the costovertebral angle is associated with infection in or

-4-

around the kidney as well as the presence of stones in the urinary tract.

19. At or about 1:15 a.m. per McCormick's order, an intravenous line was placed and Debbie received a 1000 ml fluid bolus followed by 1 mg. of Dilaudid (a pain medication) and 4 mgs. of Zofran (an anti-nausea medication).

20. In addition, McCormick ordered a CT scan of Debbie's abdomen and pelvis which was obtained at approximately 1:24 a.m. The CT revealed a 3mm stone in the right ureter (the tube carrying urine from the kidney to the bladder), right hydroureter (distension of the ureter by urine) and right hydronephrosis (swelling of the kidney due to inability of urine to drain from the kidney as a result of a blockage or obstruction).

21. By 3:35 a.m., Debbie's vital signs had deteroriated with a rise in heart rate to 120 bpm, temperature to 101.3° and blood pressure to 150/96. Her oxygen saturation had decreased to 92% and her pain was reported as 5/10 on the pain scale. Her respiratory rate had decreased to 18 per minute.

22. At 3:46 a.m., Debbie was administered Toradol 30mg IV for fever.

23. Per McCormick's note, the laboratory studies ordered by Dr. Kotora revealed a normal CBC with the exception of a white blood count of 19.4 (Normal = 3.5-10.5), a normal basic

metabolic panel except for elevations of BUN and Creatinine, and a normal urinalysis. Elevations of BUN and Creatinine are consistent with impaired kidney function.

24. At or about 4:26 a.m., Debbie was administered a second 1000 ml fluid bolus via her IV.

25. At 4:26 a.m., Debbie's heart rate was noted as 117 bpm, respiratory rate 18 per minute, and temperature 101.3°. Her oxygen saturation was 96% and she was started on oxygen via a nasal cannula.

26. At 4:45 a.m., Debbie's heart rate was noted as 109 bpm, respiratory rate 16 per minute, temperature 98.5°, blood pressure of 116/74, and oxygen saturation of 96%.

27. At 4:54 a.m., Debbie's heart rate was noted as 115 bpm, respiratory rate 16 per minute, blood pressure of 116/74 and oxygen saturation of 96%. At 4:56 a.m., her temperature was noted as 99.5°.

28. At or about 5:50 a.m., McCormick discharged Debbie with a diagnosis of acute nontraumatic right flank pain and a single stone in the right ureter. He prescribed Bactrim DS (an antibiotic), Percocet (a pain medication), Flomax (a drug that dilates the ureter) and Motrin. Debbie was instructed to return for worsening or new concerning symptoms.

29. Systemic inflammatory response syndrome (SIRS) is an inflammatory state affecting the whole body in response to an

infectious or non-infectious insult. The presence of SIRS is defined by the presence of two or more of the following SIRS Criteria: temperature >100.4° or <96.8°, heart rate >90, respiratory rate >20 or PaCO2 <32mmHG, and WBC >12,000/mm$^3$ or <4,000/mm$^3$ or >10% bands.

30. The presence of SIRS in the setting of a known or suspected source of infection meets the criteria for sepsis, a complication of infection where the chemicals released by the body to fight infection triggers an inflammatory response that can damage multiple organ systems.

31. Debbie clearly met the SIRS Criteria as she had a respiratory rate of 22/minute upon arrival at the emergency room and during the admission had a heart rate above 90, elevated white blood cell count at 19.4/mm$^3$, and she spiked a fever to 101.3°.

32. The source of Debbie's pain was identified as a stone blocking the right ureter. The stone is a foreign body and is at high risk for becoming infected. One of the most common complications of an infected stone in the ureter is urinary tract infection leading to sepsis.

33. The presence of a stone in the ureter can also block the drainage of urine from the kidney causing hydronephrosis (buildup of urine inside the kidney). One of the most common

complications of hydronephrosis is urinary tract infection leading to sepsis.

34. McCormick recognized this possibility noting, that the differential diagnosis included "appendicitis, stones, GB. UA and CT confirmed 3 mm stone with hydro (hydronephrosis). Although urine showed no infection, pt became febrile (ran a fever) in ED and had an elevated WBC of 19.4."

35. Debbie met all four of the SIRS criteria and there was a suspected or present source of infection, so she also met the criteria for sepsis.

36. Debbie's urinalysis was negative because the stone blocked the flow of the infected urine into the specimen utilized for the urinalysis.

37. Despite the source of infection, the stone, having been identified, hydronephrosis, blocked urine flow, and the fact that Debbie met sepsis criteria, no plan was put in place to manage her condition.

38. During her admission to the emergency department, Debbie received no antibiotics via the intravenous line.

39. An infected stone is an urgent condition that requires admission to a facility with urologists on staff who can remove the stone.

40. It is a breach of the standard of care to discharge a patient with an infected stone.

41. McCormick recognized the probability that Debbie had an infected stone but simply did nothing at all to treat it.

42. At 8:56 a.m. on December 4, 2016, Debbie again presented to the emergency department at the Naval Hospital Camp Lejune. The triage nurse noted that Debbie reported fever with a temperature maximum of 102°, "has trouble regulating her breathing" and feels achy all over.

43. At 9:01 a.m., her vital signs, all of which were abnormal, were heart rate, 119 bpm; respiratory rate, 28 per minute; blood pressure, 72/44; and temperature, 97.8°. Her oxygen saturation was 93%.

44. Debbie was examined by Eric Draper, M.D., who noted complaints of dyspnea (shortness of breath), chest pain, abdominal pain, dizziness and fever that started yesterday, were still present and worsening. He also noted Debbie had experienced nausea, vomiting and diarrhea.

45. Upon physical examination, Dr. Draper found Debbie appeared to be in severe distress with tachycardia (elevated heart rate), diaphoresis (sweating), and that she was confused and disoriented.

46. Dr. Draper was concerned that Debbie was suffering from septic shock, a state of acute circulatory failure where the organs do not receive oxygen, caused by the stone in her ureter accompanied by fever and elevated white blood count. He

-9-

ordered multiple laboratory studies and began treatment with IV fluids, Zosyn (antibiotic), norephinephrine and epinephrine. Norephinephrine and epinephrine are vasopressors or drugs that raise the blood pressure by constricting the blood vessels.

47. In addition, Dr. Draper consulted with the multiple physicians at Vidant Medical Center in Greenville and arranged for Debbie's transfer to the medical intensive care unit at that facility via helicopter.

48. Despite fluid administration and two vasopressors, Debbie became hypotensive upon arrival of the air transport team. At that time, a third vasopressor, phenylephrine was added.

49. At discharge from the emergency department at Naval Hospital Camp Lejeune, Debbie's diagnoses included "severe sepsis with shock, altered mental status and acute cardiovascular failure, respiratory failure and renal failure."

50. Upon arrival at Vidant Medical Center, Debbie was intubated and on December 4, 2016, underwent placement of a percutaneous nephrostomy tube into her right kidney to drain urine from her kidney into a collection bag on the outside of the body.

51. Upon arrival at Vidant Medical Center, blood was obtained for culture. The culture of Debbie's blood grew Escherichia Coli (E. Coli), which is the most common bacteria

found in infections of the urinary tract in women. The sensitivity report for the culture noted that E. Coli was resistant to Trimeth-Sulfamethoxazole or Bactrim, the antibiotic prescribed by McCormick.

52. At Vidant Medical Center, Debbie continued to require the use of vasopressors to manage her condition. As a result of the need for use of vasopressor medications to support her blood pressure, Debbie developed dry gangrene of the fingers on both hands and the toes on both feet.

53. On December 21, 2016, Debbie underwent amputation of the index, long and ring finger on her left hand and amputation of the index, long, ring and small finger on her right hand.

54. On December 23, 2016, Debbie was discharged to the Inpatient Rehabilitation Unit at Vidant Medical Center. At the time of discharge, Jennifer Stahl, M.D., noted discharge diagnoses including "septic shock (HCC) 2/2 E. coli pyelonephritis/Gram negative bacteremia" and "gangrene (HCC) of distal extremity digits 2/2 side effect of vasopressor, S/P amputation of the BL hand digits."

55. Debbie was discharged from the Inpatient Rehabilitation Unit on January 5, 2017, with orders for continued occupational and physical therapy at home. At the time of discharge, the right sided nephrostomy tube remained in

place and she was to be seen by a urologist for further management of the right uretural stone.

56. Debbie underwent amputation to the second knuckle of seven of her ten fingers which has caused her a great deal of pain, physical suffering, emotional suffering and disfigurement.

57. Debbie's amputations have made it extremely difficult for her to perfom her activities of daily living including dressing herself, cooking meals, bathing herself, and various other household chores.

58. Debbie also suffered a stroke due to her infection that has resulted in some cognitive impairment. Debbie can no longer remember as well, focus as well, and can no longer manage the household finances.

59. In January 2019, Debbie underwent partial amputation of four toes on her right foot and three toes on her left foot as a result of the injuries sustained as a result of the sepsis in 2016.

60. Debbie can no longer work as a special eduction teacher in the Onslow County School System and has been forced to give up her career and passion of helping young special needs kids.

61. Debbie has suffered painful and permanent orthopaedic and brain injuries as a result of Defendant's negligence and/or gross negligence from which she will never be the same.

Case 7:22-cv-00180-FL    Document 1    Filed 10/21/22    Page 12 of 19

## VII.  <u>FIRST CLAIM FOR RELIEF: NEGLIGENCE</u>

62. Plaintiff adopts and incorporates herein by reference Paragraphs 1 through 61 of this Complaint.

63. Defendant United States of America, by and through its employee McCormick, was negligent in its care and treatment of Plaintiff in that it:

a. Knew or should have known that Debbie was septic during her admission to the emergency department on December 4, 2016, and failed to treat her adequately according to the applicable standard of care, including faiing to take actions described below in subparagraphs c, d, e, and f;

b. Failed to recognize that Debbie was septic during her admission to the emergency department on December 4, 2016;

c. Failed to administer antibiotics intravenously in the emergency department;

d. Failed to order at discharge an appropriate antibiotic for E. Coli, the most common bacteria present in urinary tract infections in women;

e.  Failed to arrange for Debbie to be admitted to the Naval Hospital Camp Lejeune for management of sepsis; or alternatively, if the Naval Hospital Camp Lejune did not have physicians and/or equipment necessary for management

of sepsis, failed to arrange for transfer to a facility that could manage Debbie's condition;

f. Failed to obtain a urology consult to manage the ureteral stone causing obstruction of Debbie's right kidney; or alternatively, if no urology consult was available at the Naval Hospital Camp Lejune, failed to arrange for transfer to a facility at which a urology consult could be obtained;

g. Failed to use reasonable care and diligence in the application of his knowledge and skill during the care and treatment of Debbie;

h. Failed to use best judgment in the care and treatment of Debbie;

i. Failed to provide emergency medicine care in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances; and,

j. Was negligent in other ways as may be described by health care providers and expert witnesses in the course of discovery in this action.

64. As a direct and proximate result of the negligence as set forth above, Debbie has sustained painful and permanent injuries which will require medical treatment for the remainder

of her life, and she is entitled to recover damages in an amount not in excess of sixteen millon dollars ($16,000,000.00) specified in Debbie's Form 95 Claim for Damages, Injury, or Death.

### VIII.   SECOND CLAIM FOR RELIEF: GROSS NEGLIGENCE

65. Plaintiff adopts and incorporates herein by reference Paragraphs 1 through 64 of this Complaint.

66. The failures, conduct, and omissions described in Paragraph 63(a) through (i) above, and other failures, conduct, and omissions as may be described by health care providers and expert witnesses in the course of discovery in this action, constituted and was gross negligence, especially because of the information about the seriousness and extent of Debbie's condition that McCormick knew or should have known, and because McCormick knew or should have known of the serious and dire possible and likely consequences of not properly and adequately treating Debbie.

67. The failures, conduct, and omissions described in Paragraph 63(a) through (i) above, and other failures, conduct, and omissions as may be described by health care providers and expert witnesses in the course of discovery in this action, reflected and constituted a reckless disregard of Debbie's rights and safety.

68. As a direct and proximate result of the gross negligence and reckless disregard of Debbie's rights and safety as set forth above, Debbie has sustained painful and permanent injuries which will require medical treatment for the remainder of her life, and she is entitled to recover damages in an amount not in excess of sixteen millon dollars ($16,000,000.00) specified in Debbie's Form 95 Claim for Damages, Injury, or Death.

## IX. **DAMAGES**

69. Plaintiff adopts and incorporates herein by reference Paragraphs 1 through 68 of this Complaint.

70. As a direct and proximate result of Defendant's negligence and/or gross negligence as averred in this Complaint, Debbie has been damaged both generally and specially, including, but not limited to, the following:

a. severe and permanent injury;

b. physical pain and discomfort both past and future;

c. mental and emotional suffering both past and future;

d. disfigurement;

e. loss of use of parts of her body;

f. medical expenses and other necessary expenses for her care and treatment both past and future;

g. lost income; and,

-16-

h. loss of enjoyment of her life and recreation both past and future.

71. The cap on noneconomic damages in N.C. Gen. Stat. § 90-21.19 does not apply to Debbie's claims against Defendant because Debbie suffered disfigurement, loss of use of parts of her body, and permanent injury, and the acts and failures of Defendant, by and through its employee McCormick, which are the proximate cause of Debbie's injuries, were committed in reckless disregard of Debbie's rights and/or were grossly negligent (as those words are used in N.C. Gen. Stat. § 90-21.19(b)(2)).

## X. COMPLIANCE WITH RULE 9(j) OF THE NORTH CAROLINA RULES OF CIVIL PROCEDURE

72. Plaintiff objects to the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure on the basis that this rule requires Plaintiff to prove her claim before Plaintiff may conduct discovery or access the courts. As applied, Rule 9(j) violates Plaintiff's right to due process, equal protection under the law, trial by jury, and access to the courts as guaranteed by Article 1, §§ 18, 19, and 25 of the North Carolina Constitution and Amendments VII and XIV of the United States Constitution.

73. Without waiving these objections and specifically relying upon the same, the medical care in this action was reviewed by person(s) reasonably expected to qualify as expert

witnesses pursuant to Rule 702 of the North Carolina Rules of Evidence and who are willing to testify that the medical care did not comply with the applicable standard of care, that the medical care was administered with reckless disregard to the rights of Debbie, and that the medical care rendered was grossly negligent. To the extent that the amendment to Rule 9(j) effective October 1, 2011, applies to the claims against Defendant all medical records pertaining to the alleged negligence and/or gross negligence that are available to the Plaintiff after reasonable inquiry have been reviewed by person(s) reasonably expected to qualify as expert witnesses pursuant to Rule 702 of the North Carolina Rules of Evidence and who are willing to testify that the medical care did not comply with the applicable standard of care.

WHEREFORE, Plaintiff prays judgment of the Court as follows:

1.    That the Plaintiff have and recover judgment of the Defendant in an amount not in excess of $16,000,000.00 as specified in Plaintiff's Form 95 Claim for Damages, Injury, or Death.

2.    That the costs of this action be taxed against Defendant;

3.    For such other and further relief to which Plaintiff may be entitled under the allegations set forth herein; and

4. For such other and further relief as the Court may deem just and proper.

This the 21st day of July, 2022.


Respectfully Submitted,

/s/Edward Yount
Edward Yount
R. Steve Bowden & Associates, P.C.
806 Summit Avenue
Greensboro, NC 27405
(336) 373-0981
Fax: (336) 370-4172
eyount@sbowden.com
State Bar No. 33065
Attorney for Plaintiff

-19-